# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BERTRAM COOPER | : | |
| Plaintiff, | : | No.: 3:03CV1694(DJS) |
| v. | : | |
| UNITED STATES POSTAL SERVICE;<br>JOHN E. POTTER, in his official capacity as<br>Postmaster General of the United States Postal<br>Service; RONALD G. BOYNE, in his official<br>capacity as Postmaster of the<br>Manchester, CT Post Office; FULL GOSPEL<br>INTERDENOMINATIONAL CHURCH, INC.,<br>DR. PHILIP SAUNDERS HERITAGE<br>ASSOCIATION, INC., and SINCERELY YOURS,<br>INC. | :<br><br>:<br><br>:<br><br>:<br><br>:<br><br>: | December 27, 2004 |
| Defendants/Intervenor Defendants. | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    Introduction...................................................................................................................1

II.   Statement of Facts.........................................................................................................2

      A.    Procedural History ................................................................................................2

      B.    Signage and Symbols at the SYI CPU....................................................................3

      C.    The USPS and Contract Postal Units......................................................................6

            1.    The USPS derives its authority over the U.S. Mail from the U.S.
                  Constitution and federal statutes and regulations ..........................................6

            2.    The USPS establishes CPUs pursuant to its regulatory authority,
                  and empowers them to assume certain official USPS functions....................7

            3.    The USPS exercises substantial oversight of CPUs, which represent
                  the USPS in the eyes of the public.................................................................8

      D.    The SYI CPU and the Church................................................................................10

            1.    The USPS was closely involved in the solicitation, evaluation,
                  selection, design and construction of the SYI CPU, and remains
                  entwined in its operations and administration ..............................................10

            2.    The Church see the SYI CPU as an "outreach" to the community...............13

III.  Summary Judgment Standard .................................................................................15

IV.   Argument ....................................................................................................................15

      A.    The Displays at the SYI CPU are Government Speech and Are Prohibited
            Under the Establishment Clause ............................................................................17

            1.    The SYI CPU is a government actor...............................................................17

                  a.    The USPS has delegated a public function to the SYI CPU.............18

                  b.    The USPS is closely entwined with the management and
                        control of the SYI CPU....................................................................21

            2.    The displays at the SYI CPU clearly appear to the reasonable observer
                  to endorse a particular religious viewpoint, in violation of the
                  Establishment Clause....................................................................................24

      B.    Even if the SYI CPU Were Not a Government Actor, its Actions Would Still

i

       Violate the Establishment Clause. ............................................................................29

   C.    Defendants' Special Defenses are Invalid as a Matter of Law ..................................33

V.    Conclusion ............................................................................................................................34

.

## TABLE OF AUTHORITIES

*Agostini v. Felton,*
    521 U.S. 203 (1997)................................................................................................24

*Am. Jewish Congress v. Corp. for Nat'l and Community Service,*
    323 F. Supp. 2d 44 (D.D.C. 2004) .......................................................................34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................................15

*Barton v. City of Bristol,*
    294 F. Supp. 2d 184 (D. Conn. 2003) ..................................................................15

*Board of Educ. of Kiryas Joel Village School Dist. v. Grumet,*
    512 U.S. 687 (1994)...........................................................................................20, 21

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,*
    531 U.S. 288 (2001)...................................................................................18, 21, 23

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dpt. of Health and Human Resources,*
    532 U.S. 598 (2001)................................................................................................28

*Burton v. Wilmington Parking Auth,*
    365 U.S. 715 (1961)................................................................................................22

*Capitol Square Review and Advisory Board v. Pinette,*
    515 U.S. 753 (1995).......................................................................................*Passim*

*Chabad-Lubavitch of Vermont v. City of Burlington,*
    936 F.2d 109 (2d Cir.1991)................................................................................25-26

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)................................................................................................33

*Coe v. Bell,*
    161 F.3d 320 (6th Cir. 1998) ...............................................................................30

*Columbia Union College v. Oliver,*
    254 F.3d 496 (4th Cir. 2001) ...............................................................................31

*Commack Self-Service Kosher Meats, Inc. v. Weiss,*
    294 F.3d 415 (2d Cir. 2002)..................................................................................24

*County of Allegheny v. American Civil Liberties Union,*
    492 U.S. 573 (1989)................................................................15-17, 24-26, 29

*Creatore v. Town of Trumbull,*
    68 F.3d 59 (2d Cir.1995)................................................................................25

*DeStefano v. Emergency Housing Group, Inc.,*
    247 F.3d 397 (2d Cir. 2001)..........................................................................31

*Edwards v. Aguillard,*
    482 U.S. 578 (1987)......................................................................................24

*Elewski v. City of Syracuse,*
    123 F.3d 51 (2d Cir. 1997)...................................................................25-26, 30

*Evans v. Newton,*
    382 U.S. 296 (1966)......................................................................................22

*Ford v. McGinnis,*
    352 F.3d 582 (2d Cir. 2003)..........................................................................33

*Freedom from Religion Foundation, Inc. v. City of Marshfield,*
    203 F.3d 487 (7th Cir. 2000) ..............................................................26, 29, 31

*Gentala v. City of Tucson,*
    244 F.3d 1065 (9th Cir.2001) ........................................................................31

*Giannattasio v. Stamford Youth Hockey Assoc., Inc.,*
    621 F. Supp. 825 (D. Conn. 1985)..................................................................21

*Global Relief Foundation, Inc. v. O'Neill,*
    315 F.3d 748 (7th Cir. 2002) .........................................................................28

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady County,*
    252 F.3d 545 (2d Cir. 2001)......................................................................18, 21

*Gunning v. Runyon,*
    3 F.Supp.2d 1423 (S.D. Fla. 1998) ................................................................28

*Jackson v. Metropolitan Edison Co.,*
    419 U.S. 345 (1974)......................................................................................19

*Janusaitis v. Middlebury Volunteer Fire Dept.,*
    607 F.2d 17 (2d Cir. 1979)........................................................................18-21

*Kaplan v. City of Burlington,*
    891 F.2d 1024 (2d Cir.1989).....................................................................25-26

*Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988)...........................................................................................30

*Larkin v. Grendel's Den, Inc.,*
    459 U.S. 116 (1982)...........................................................................................15

*Lebron v. National Railroad Passenger Corp.,*
    513 U.S. 374 (1995)...........................................................................................33

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971)................................................................................ 16, 24, 28

*Longo v. U.S. Postal Service,*
    938 F. 2d 9 (1992).............................................................................................33

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)........................................................................ 1, 15, 24-26

*Marks v. United States,*
    430 U.S. 188 (1977)...........................................................................................30

*Marsh v. Alabama,*
    326 U.S. 501 (1946)...........................................................................................19

*Mehdi v. U.S. Postal Service,*
    988 F. Supp. 721 (S.D.N.Y. 1997) ....................................................................25

*Mitchell v. Helms,*
    530 U.S. 793 (2000)...........................................................................................31

*Santa Fe Independent School Dist. v. Doe,*
    530 U.S. 290 (2000)...........................................................................................17

*Sefick v. Gardner,*
    164 F.3d 370 (7th Cir. 1998) ............................................................................28

*St. Ledger v. Area Cooperative Educational Services,*
    228 F.Supp.2d 66 (D. Conn. 2002)....................................................... 15, 18, 23

*Terry v. Adams,*
    345 U.S. 461 (1953)................................................................................... 19, 21

*U.S. Postal Service v. Brennan,*
    574 F.2d 712 (1978)......................................................................................7, 20

*West v. Atkins*,
    487 U.S. 42 (1988) ............................................................................................ 19-21

## Statutes

39 U.S.C. § 201 (1970) ................................................................................................. 6

39 U.S.C. § 404 (2003) ............................................................................................ 7, 20

39 U.S.C. § 401 (2003) ................................................................................................ 7

42 U.S.C. § 2000bb .................................................................................................... 33

42 U.S.C. § 2000cc ..................................................................................................... 33

U.S. Constitution., Article. 1, § 8 ............................................................................... 20

## I.    Introduction

The facts in this case are relatively simple and undisputed.  The federal government, through the United States Postal Service ("USPS"), has contractually delegated a governmental (indeed, a Constitutional) function -- the provision of United States Mail goods and services -- to an evangelical church, whose express mission is to "engage in the preaching of the gospel of Jesus Christ in the State of Connecticut and in the United States, and in foreign lands ... and to establish among other things churches, whenever and wherever possible, for the advancement of the kingdom of Jesus Christ."  Plaintiff's Local Rule 56(a)1 Statement ("SMF"), ¶ 77.  The church, in turn, offers those governmental goods and services under official USPS signage, from a space that appears to be a typical U.S. post office, but in an environment that is replete with explicitly Christian religious symbols and messages.

The legal implications of these facts are equally clear.  The church's contract postal unit, known as "Sincerely Yours, Inc." (the "SYI CPU"), is functioning as an arm of the federal government, exercising a uniquely governmental function, but it is doing so in a manner that is clearly prohibited by the Establishment Clause of the First Amendment of the United States Constitution ("Establishment Clause").  To any reasonable observer, the government is endorsing the explicitly religious message of a particular church, which is aimed at -- and offensive to -- persons who choose to hold different beliefs, including Plaintiff.  *See Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.").

1

Defendants do not dispute any of the facts material to Plaintiff's claims. They readily acknowledge the sectarian nature of the displays that pervade the SYI CPU – displays that include "prayer cards" inviting customers to "Let us Join With You in Prayer" and various New Testament passages. *See infra* at II.B. They further concede that the USPS has contracted with the CPU to offer U.S. postal goods and services; that customers recognize CPUs as representing the USPS; that the USPS takes a range of steps, by regulation and otherwise, to promote that identification; and that the USPS is closely involved in the solicitation, evaluation, selection, design, construction, appearance and administration of CPUs. *See infra* at II.C, D.1. Yet the USPS has failed to promulgate and enforce rules preventing CPUs, including SYI, from engaging in conduct that is plainly inconsistent with the central tenets of the Establishment Clause while exercising the governmental powers contractually vested in them.

For these reasons and those set forth below, the Court should grant Plaintiff summary judgment to remedy this fundamental violation of his constitutional rights.

## II.    Statement of Facts

### A.    Procedural History

Plaintiff Bertram Cooper ("Plaintiff"), a World War II and Korean War veteran and Manchester resident, lives considerably closer to the SYI CPU than to the "official" Manchester post office on Sheldon Street. SMF ¶ 1. As a result, he visited the CPU on a number of occasions. While he was there, however, the religious displays made him very uncomfortable. SMF ¶ 2. On one occasion, Mr. Cooper complained about the displays to employees at the CPU. SMF ¶ 3. In response to Mr. Cooper's concerns, the SYI CPU employee at the counter informed Mr. Cooper that if he did not like it, he could go somewhere else. SMF ¶ 4. He has since done

this, even though it is more difficult for him to travel to the official Manchester Post Office and this has caused him substantial inconvenience. SMF ¶ 5.

Plaintiff initiated this action on October 3, 2003 against the USPS, U.S. Postmaster General John E. Potter, and Manchester Postmaster Ronald G. Boyne ("Boyne"). His Complaint alleges that the USPS's conduct, as described herein, violated his rights under the Establishment Clause, and seeks declaratory and injunctive relief as well as attorneys fees, costs, and such other relief as justice may require. On July 30, 2004, the Court granted the motion of the Full Gospel Interdenominational Church, Inc. ("FGIC"), the Dr. Philip Saunders Heritage Association, Inc. ("DPSHA"), and Sincerely Yours, Inc. (collectively, "the Church"), related parties all involved in the administration of the SYI CPU, to intervene as additional defendants.[1] Discovery, including numerous depositions of USPS and Church representatives, completed in September 2004. Plaintiff now moves for summary judgment on his claims.

### B.   Signage and Symbols at the SYI CPU

The SYI CPU looks from the outside much like any other post office. The outside wall facing the street is clearly labeled as a branch of the United States Post Office, with a large, lighted sign to that effect, including the official stylized "eagle" logo of the USPS. SMF ¶ 6. This sign also includes, in substantially smaller type, the words "Contract Office," with no explanation of the meaning or significance of that term. *Id.* Another sign over the threshold to the building reads "Sincerely Yours," with depictions of old-fashioned letter-writing paraphernalia. SMF ¶ 7. To the right of these two signs is a much smaller sign that hangs out from the wall at a 90-degree angle, which says, in small cursive type, "Sincerely Yours, Inc.," and in small print type, "United States Contract Post Office." SMF ¶ 8.

---

[1] The term "defendants" as used in this Memorandum will collectively refer to all defendants.

3

Yet the interior of the SYI CPU offers a mélange of official USPS signage, goods and services and a range of displays promoting Christian religious messages, advertising the missionary work of the Church and related organizations, and generally promoting the religious messages to which the Church is dedicated.  Upon entry into the SYI CPU, a postal counter – which, as will be discussed *infra* at II.D.1, the USPS paid for and constructed – sits immediately to a customer's right.  SMF ¶ 9.  The counter consists of a half-height wall, part of which is lower than the rest, and all of which is covered by a flat surface on which various materials are displayed.  Behind this counter is a "slat wall," also built by the USPS, upon which USPS materials are prominently displayed.  SMF ¶ 10.  On the wall directly to the right of the postal counter and slat wall is a large display including pictures of people in clearly religious poses, surrounding a calligraphic sign informing customers about Jesus Christ and inviting them to submit a request if they "need prayer in their lives."  SMF ¶ 11.  Specifically, this display states:

> Do you or someone you know need prayer?  At this very moment someone is praying in our 24 hour Prayer Tower and we would love to pray for you.  Please drop your request into our confidential prayer box, or if you would prefer to speak to someone personally, call our Church office.  Once your need has been answered, we'd be so happy to hear from you.  Please call our Church office at (860) 646-8731 and let our receptionist know that God has answered your prayer. trust in him at all times; ye people pour out your heart before him: God is a refuge for us Psalm 62:8.  When you feel you're all alone, and your heart would break in two, remember, someone is praying for you.

SMF ¶ 12.  Directly on the postal counter next to this display sits a pile of "prayer cards" and a box into which postal service customers can put their prayer requests. SMF ¶ 13. The cards state:

> Twenty four hours a day someone is on their knees praying for the needs of others.  If you have a prayer request you can fill out this prayer card or call our church office at any time.  If you receive an answering machine leave a message.  Your call will be received and someone will be praying on your behalf.

*Id*. The reverse side of the card implores readers to "Let us Join With You in Prayer.  We have a 24-hour prayer tower at the Full Gospel Interdenominational Church, Inc. continually praying on

behalf of others." The cards also contain a space for people to write down their names and their prayer requests. *Id.* Also on the postal counter, on a somewhat lower ledge, is "a World-Wide Lighthouse Missions coin donation jar decorated with mission photos." SMF ¶ 14.[2]

To the left of the postal counter, and directly ahead of and in plain view of customers waiting in line at the postal counter, a television monitor displays Church-related religious videos. SMF ¶ 15. These audio-visual displays have included videotaped talks by Reverend Eleanor Kalinsky, lead pastor at the FGIC and President of Sincerely Yours, Inc., on various Christian topics; videos explaining the mission of World-Wide Lighthouse Missions, Inc.; a video highlighting the activities of the Church's Sunday School program; a video of performances from several of the Church's choirs; a video entitled "God's Thoughts Toward Us," promoting the Church's Vacation Bible School; and other videos of television broadcasts "includ[ing] audible soundtracks with scripture messages and Gospel songs." SMF ¶ 16.[3]

Customers purchasing postal products at the CPU see various other displays and materials highlighting religious messages and activities of the Church interspersed among the official USPS post office boxes and other postal paraphernalia. SMF ¶ 18. The largest display is a framed advertisement for World-Wide Lighthouse Missions, a missionary organization incorporated by the Church, to which the CPU's profits are designated. SMF ¶ 19. This display, which sits directly opposite a shelving unit containing official USPS postal supplies and forms and above a table used by customers filling out that paperwork, offers biblical quotations and

---

[2] At some point after the present action was filed, the USPS also placed a sign on this lower counter, adjacent to the donation jar, indicating that the USPS "does not endorse the religious viewpoint expressed in the materials posted at this Contract Postal Unit." *See* Plaintiffs' Appendix, Tab 27. For the reasons set forth *infra* at 27 and n. 14, this disclaimer does not solve the constitutional violations at issue here.

[3] One of these videos depicts the grand opening of the SYI CPU, at which numerous local political figures were in attendance. SMF ¶ 17.

explains that the organization "Endeavor[s] to Reach the World with the Love of Jesus Christ, one life at a time." *Id.* Directly to the right of this bulletin board is another display providing more information about World-Wide Lighthouse Missions, including pamphlets describing various "hands of ministry" trips, as well as envelopes and "appeal flyer[s]" soliciting donations. SMF ¶ 20. To the right of this display, immediately to the left of the USPS postal boxes, is another donation box, decorated with World-Wide Lighthouse Missions mission photographs. *Id.*

Above the official USPS rental boxes on the wall across from the transaction counter are various 8 ½ x 14" photographs of a number of Full Gospel Interdenominational Church events. SMF ¶ 21. Among these photographs is a picture of "Wally," a "character ... that brings ... little Bibles, messages through puppets and acting out skits ... . [when] we reach in our community one Saturday a month ... [to] kids in our community, you know maybe not going to church or [who] have no Sunday School ...," standing beside depictions of George Washington and Abraham Lincoln. SMF ¶ 22.[4]

### C.    The USPS and Contract Postal Units

#### 1.    The USPS derives its authority over the U.S. Mail from the U.S. Constitution and federal statutes and regulations.

The United States Postal Service derives its authority from a provision in the Constitution of the United States, Art. I, § 8 ("The Congress shall have power ... To establish post offices and post roads"). SMF ¶ 24. The Postal Reorganization Act, 39 U.S.C. § 201, *et seq.*, which reconfigured and renamed the postal system in 1970, "established, as an independent establishment of the executive branch of the Government of the United States, the United States

---

[4] In addition to these regular displays, the SYI CPU features additional seasonal displays, including a large extended crèche scene displayed in the unit's large storefront window during the Christmas holiday season. SMF ¶ 23.

Postal Service." SMF ¶ 25. Congress bestowed upon the USPS exclusive control over "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail," "provid[ing] and sell[ing] postage stamps and other stamped paper, cards, and envelopes and ... provid[ing] such other evidences of payment of postage and fees as may be necessary or desirable." 39 U.S.C. § 404 (2003). SMF ¶ 26. While there are today a range of other providers of overnight and package delivery (e.g., Federal Express, UPS), the USPS maintains its monopoly over traditional "letter mail." *See, e.g., U.S. Postal Service v. Brennan*, 574 F.2d 712, 713-714 (1978).

### 2. The USPS establishes CPUs pursuant to its regulatory authority, and empowers them to assume certain official USPS functions.

The USPS' "Glossary of Postal Terms" defines a "contract postal unit" as "[a] postal unit that is a subordinate unit within the service area of a main post office. It is usually located in a store or place of business and is operated by a contractor who accepts mail from the public, sells postage and supplies, and provides selected special services (for example, postal money order or registered mail)." SMF ¶ 27. The USPS relies upon contract postal units to bring postal services to areas in which it determines it unfeasible to establish an official (or "classified") post office.[5] SMF ¶ 28.[6] The USPS establishes CPUs pursuant to its authority under, *inter alia*, 39 U.S.C. § 401 (2003) ("The Postal Service shall have the following general powers: ... to enter into and perform contracts, execute instruments, and determine the character of, and necessity for, its expenditures"). SMF ¶ 30.

---

[5] The USPS calls traditional government-run Post Offices "classified units," defined as "[p]ost office stations and post office branches operated by USPS employees in quarters owned or leased by the USPS." SMF ¶ 29.

[6] Robert Evans is a purchasing Specialist with the USPS, and was involved with the award of the CPU contract to the Church. William Peairs is a Purchasing and Supply Management Specialist with the USPS, and "lead[s] the team responsible for award [of CPU contracts] and ... oversee[ing] administration [of] contracts." SMF ¶ 31.

By delegating postal services to other entities, such as the Church in this case, the government reduces its costs while maintaining regulatory and supervisory authority over the provision of U.S. postal services.  In exchange, the government allows the contracting party to keep a portion of the revenue generated from the sale of postal goods (or, in certain cases, simply pays the contracting party a "rent" for operation of the unit).[7]  SMF ¶ 32.  The USPS determines where it wishes to place a CPU, then engages in an intensive solicitation and evaluation process to select a contracting party, "choose[s] which services they provide," and then supervises the design, construction and management of these units.  SMF ¶ 33.  Employees charged with running the postal services of a CPU "actually get the same training that a postal clerk would get."  SMF ¶ 34.

### 3. The USPS exercises substantial oversight of CPUs, which represent the USPS in the eyes of the public.

The USPS has established myriad guidelines for contractors operating CPUs relating to the "image" that these units present to the public.  The USPS's "Postal Operations Manual" cautions that "the appearance of your unit reflects not only on you as a business person but also on the postal service ... .  It is very important to the success of your unit that customers can recognize you as an official United States Post Office contract unit."  SMF ¶ 35.  Thus, the USPS closely regulates the number, type and appearance of official postal service signage at CPU sites, SMF ¶ 36, but this emphasis on image goes much further – even to concern about the impression CPU employees make on people who enter the CPU to purchase USPS goods and services.  The Postal Operations Manual reminds employees "that [they] represent the postal service to [their] customers."  SMF ¶ 37.  Another USPS manual provides that "[a]ll contractor employees must project a favorable image of the Postal Service at all times."  SMF ¶ 38.  As Ronald Boyne,

---

[7] *See infra* at 11 for a discussion of the recent shift in funding alternatives for CPUs.

Postmaster for the official Manchester post office and USPS representative responsible for the SYI CPU, testified, these guidelines emphasize the importance of maintaining the uniform appearance and image of CPUs, "[b]ecause they represent the post office." SMF ¶ 39.

Each CPU has a Contracting Officer's Representative ("COR"), usually the Postmaster for the local classified unit, who is responsible for ensuring that the CPU "adhere[s] to postal regulations, ... [and] abide by the contract." SMF ¶ 40. CORs also handle "any problems, customer complaints and all." *Id.* As the local contact tasked with overseeing the operations of the CPU, the COR is also responsible for conducting "on-site operational reviews" of the CPU. SMF ¶ 41. In conducting these reviews, he "walk[s] through, ... watch[es] a few transactions, ... make[s] sure that [the CPU's employees are] saying the right things to the customers ...." SMF ¶ 42. Boyne, who is the COR for the SYI CPU, SMF ¶ 43 – and also an active member and trained "gospel worker" in the Church, SMF ¶ 44 – acknowledges that it is important that CPU employees treat customers "like postal employees would treat them," because "they're hired as an arm of the postal service that is a contract postal unit. They do the work of the postal service there." SMF ¶ 45.

As part of its control over the look and feel of CPUs, the USPS also places significant limits on the contracting party's other activities within the CPU space. Among other things, the USPS regulates (a) the types of products that can be sold in the CPU and even in spaces adjacent to these units (i.e., prohibiting the sale of alcohol in or near the CPU); (b) the way other goods and services can be offered in the space (i.e., prohibiting the intermingling of postal and other products); and even (c) certain types of written materials and signage in the CPU space (i.e., prohibiting the sale or display of pornographic materials, and possibly racist or similar propaganda). SMF ¶ 46. Moreover, the USPS reserves the right to terminate the CPU contract

9

on 60 days written notice, or, "if necessary to protect the Postal Service's interest," on one day's such notice. SMF ¶ 47.

Thus, the USPS retains and routinely exercises the authority to closely regulate the appearance of, and communications by, CPUs. And, as evidenced by the USPS's regulation of similar displays in classified post offices, the USPS is well aware of Establishment Clause concerns: The USPS expressly prohibits the posting or display of "[r]eligious symbols or matter," and seasonal displays of "[s]ymbols identified with a particular religion, including but not limited to nativity scenes, crosses, or and the Star of David." SMF ¶ 48. Postal regulations also provide, more generally, that "[t]he Postal Service must avoid the appearance of favoring any particular religion or religion itself." *Id.* But the USPS has chosen not to apply these same policies to the activities of CPUs, and in particular, to turn a blind eye to the explicitly religious messages displayed throughout the SYI CPU.

### D.    The SYI CPU and the Church

#### 1.    The USPS was closely involved in the solicitation, evaluation, selection, design and construction of the SYI CPU, and remains entwined in its operations and administration.

There has been a CPU on Main Street in Manchester, Connecticut since at least 1991. SMF ¶ 49. The CPU that immediately preceded SYI, the "Community Place," located in a card store, provided postal services to a large segment of the Manchester population for whom the cross-town trek to the official (classified) Post Office was too burdensome or inconvenient. SMF ¶ 50. When, in October 2001, the Community Place chose to discontinue its CPU services, public outcry forced the USPS to consider its options in replacing those services. SMF ¶ 51. Although the USPS considered establishing a second classified unit to serve the Community Place's former customers, it ultimately decided to solicit a new CPU to fill the void. SMF ¶ 52.

As part of its extended selection process for the new contracting party, the USPS engaged in three separate solicitations before finding what it deemed to be an acceptable bidder. SMF ¶ 53. The first solicitation resulted in only one bid, submitted by Robert Dorin, the owner of Manchester Hardware, located on Main Street in Manchester. SMF ¶ 54. The USPS rejected that bid, which requested an annual fee of $225,000 to construct and run the proposed CPU, as "in excess of the postal estimate." SMF ¶ 55. The USPS similarly rejected Mr. Dorin's bid during the second solicitation, which requested $160,000 for build out costs and annual "rent." SMF ¶ 56. The USPS then circulated a third solicitation. This time, the Church submitted a bid in competition with Mr. Dorin. SMF ¶ 57.

At the time the Contract was awarded, the USPS' contracting process was evolving. SMF ¶ 58. Under the previous system, the USPS simply paid a monthly "rent" to CPUs, and did not pay for any of the "build out" of the CPU space. SMF ¶ 59. Some time during the Manchester solicitation process, however, the USPS began awarding "performance-" or "revenue-based" contracts, through which contractors are paid a percentage of the total revenue generated by the CPU. SMF ¶ 60. The third solicitation for the Manchester postal unit was under this new regime, and the responding parties had to provide a revenue percentage that they were willing to accept. SMF ¶ 61. The Church offered a lower revenue figure than the hardware store. SMF ¶ 62.[8] After a brief comparative evaluation process, the USPS awarded the contract ("the Contract") to the Church. SMF ¶ 63. Reverend Kalinsky signed the Contract on behalf of the Church; some time thereafter, FGIC incorporated Sincerely Yours, Inc. and it became the contracting entity. SMF ¶ 64.

---

[8] However, it is notable that the USPS ultimately requisitioned $160,000 for the postal unit at the culmination of that third solicitation, in which it selected the Church to operate the CPU – precisely the amount rejected as too high in the hardware store's final bid. SMF ¶ 65.

At the same time as it moved to revenue-based CPU contracting, the USPS also began placing a greater emphasis on the "postalizing" of CPU space, aimed at ensuring uniformity among CPUs so that customers easily identify official CPUs as tied to the USPS. SMF ¶ 66. As part of the postalizing process, the USPS began funding, or assuming direct responsibility for, the construction or "build out" of the CPU area. SMF ¶ 67. In particular, the USPS often pays for the build out of a "counter that is very much identified as a postal [counter]" in these performance-based contract units, "so that when you walk into a [CPU] you know you are doing business with the Postal Service." SMF ¶ 68. This work is done "wherever [the USPS] put[s] these CPUs. It's to maintain a consistency in how they look." SMF ¶ 69. "Obviously, the USPS controls the design and appearance of this [space]." *Id.*

Thus, "when the contract was awarded to the Full Gospel Church, [the USPS] ... hired a contractor to build [the areas for which the USPS had] responsibility [in] the CPU, which [were] ... the counters, the slat wall behind it, the little office adjacent to it." SMF ¶ 70. During the construction process, Boyne was at the SYI CPU "almost everyday checking on [his] people, because [the USPS] built part." SMF ¶ 71.

This construction was hardly the end of USPS involvement in, and oversight of, the SYI CPU. The USPS determines the products that the CPU is allowed to offer and sets the prices that it is allowed to charge; the hours that the unit must remain open; and the employees' schedules. SMF ¶ 72. Moreover, Reverend Kalinsky stated in her deposition that the criteria for hiring employees and even the wages that those employees would be paid were all required to be set in consultation with the USPS. SMF ¶ 73.

As noted above, Boyne functions as the COR responsible for overseeing the SYI CPU. SMF ¶ 43. In that capacity, he represents the USPS in monitoring the Church's compliance with

the terms of its contract, and is involved in both the overall functioning of the CPU and its appearance. SMF ¶ 74. One of Boyne's subordinates, Nicola Piro, acts as another liaison between the USPS and the SYI CPU. SMF ¶ 75. According to Boyne, Mr. Piro communicates with the CPU two to three times a week. *Id.* Mr. Piro is also responsible for conducting annual audits of the CPU, including on-site walk-throughs, to ensure that the Church is running the unit – and representing the USPS – appropriately. SMF ¶ 76.

### 2. The Church sees the SYI CPU as an "outreach" to the community.

Full Gospel Interdenominational Church is an evangelical church based on Main Street in Manchester. Pursuant to its charter, its mission is to "engage in the preaching of the gospel of Jesus Christ in the State of Connecticut and in the United States and in foreign lands ... and to establish among other things churches, whenever and wherever possible, for the advancement of the kingdom of Jesus Christ[,]" and to "send forth preachers and workers whose principle objective shall be to promote the Kingdom of the Lord Jesus Christ." SMF ¶ 78. Along with the other intervening defendants, the FGIC is involved in outreach into the community both to adults and children, and many of its members have earned the title of "gospel workers," meaning that they have undertaken extended training in evangelical skills and "work in outreach ministries." SMF ¶ 79.

Reverend Mancini, FGIC's assistant pastor and the individual primarily responsible for the negotiation of the SYI CPU contract, explained in his deposition that the Church decided to bid for the Manchester CPU in order to provide a service to the community. SMF ¶ 80. However, he acknowledged that the Church sees the operation of the CPU as consistent with its mission, and that it is "us[ing] the postal unit to further the mission of the church" – "to offer to someone if they're in need, for instance, if they need prayer, please contact our church office."

*Id.* He also noted that "[w]e're there as an outreach, but we're also there as a business, ... so we have to take that into consideration with what we're doing." *Id.* All of the profits from the CPU are designated to go to the World-Wide Lighthouse Missions, Inc., the Church's missionary outreach arm. SMF ¶ 81.

Reverend Mancini explained that the Church decided not to sell any other goods or services from the CPU space, but that the religious displays throughout the premises were a way of "selling [the church's] product." SMF ¶ 82.[9] He further noted that the SYI CPU is "there as an extended hand, friendship, you know, prayer, that kind of thing. That's kind of how we run it." SMF ¶ 84. He expressed his view that as long as the Church was providing a service to the community he did not "see what the problem [was] with" the Church "applying their message to the community at the same time." *Id.* "[E]verything we have there is designed to make people acquainted with what we do ... if [they] want to know more about these things, we direct them to our church office and to Worldwide Lighthouse Missions' main office." *Id.* Notably, Reverend Mancini acknowledged that all four of the CPU's employees are trained gospel workers. SMF ¶ 85.

Reverend Kalinsky echoed these sentiments. She explained that she and her Church got involved with the CPU to "share what I have, what has made my life so complete, and to be kind to my community, and our church has done that long before SY ever arrived." SMF ¶ 86. Reverend Kalinsky also stated that "we decided ... to make [the CPU] a place where it would

---

[9] Interestingly, when it described the proposed "physical characteristics" of the CPU in its response to the USPS' solicitation for the Main Street CPU, the Church did not mention any religious displays and indicated only that it would "be posting advertisements for local non-profit community outreach agencies such as MARC, Inc., Heart Association, flu clinics, cancer agencies, et cetera," SMF ¶ 83. Today, however, the SYI CPU has chosen instead to highlight almost exclusively the sectarian activities and messages of the Church.